UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:15-cv-00033-MOC-DCK

| | |
|---|---|
| **SUSAN DYER,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| Vs. | ) ORDER |
| | ) |
| **CITY OF GASTONIA,** | ) |
| | ) |
| Defendant. | ) |

**THIS MATTER** is before the court on Defendant's Motion for Summary Judgment (#13), which has been fully briefed and is ripe for review. The court heard oral arguments on the motion on February 10, 2016.

I. INTRODUCTION

The facts of this case are as follows. The Schiele Museum of Natural History is an agency of the City of Gastonia and falls under the Parks, Recreation and Cultural Services Department. (Deposition of Dr. Ann Tippitt (#14-7; 17-4) (hereinafter "Tippitt Depo.") pp. 26-28). Dr. Ann Tippitt is the Director of the Museum. Chuck Dellinger is the Director of the Parks, Recreation, and Cultural Services Department. (Tippitt Depo. p. 10; Deposition of Chuck Dellinger (##14-2;17-9) (hereinafter "Dellinger Depo.") pp. 7-9). Tony Pasour has been employed in various management positions at the Museum since 1993. He has been the Head of Interpretation at the Museum since 2010. (Tippitt Depo. pp. 13- 15; Deposition of Tony Pasour (##14-6; 17-5) (hereinafter "Pasour Depo.") pp. 6-8). In the spring of 2012, Pasour interviewed Plaintiff and recommended that she be hired to fill the part-time Guest Services Specialist

position. (Pasour Depo. p. 47). Her primary duties were to interact with the museum's school field trip clients and schedule these clients for the various educational events at the museum. (Pasour Depo. pp. 48- 49).

Defendant states that by mid-summer of 2012, Plaintiff began to demonstrate performance issues by virtue of poor customer service skills and instances of unprofessional interactions with customers and staff. (Pasour Depo. pp. 49-71; (#14-9)). Pasour's deposition testimony indicates that he generally had concerns with her attitude and interpersonal skills more than concerns about her ability to handle tasks, see (Pasour Depo. 100-06), but that there was an incident with scheduling a field trip which he considered direct insubordination on the part of Plaintiff. (Id. at 103). The record indicates that four separate incidents occurred between August and November 2012 which Pasour found to be inappropriate or unacceptable work behavior. See (#14-9 at p. 3-4) (written statement of incidents). In the fall of 2012, Pasour talked with Tippitt and recommended that Plaintiff be terminated, and Tippitt agreed. (Pasour Depo. pp. 109-110; Tippitt Depo. pp. 85, 106-107; Dellinger Depo. pp. 57-58). However, Dellinger suggested a three day suspension instead. (Pasour Depo. pp. 110-111). On November 29, 2012, Plaintiff was issued a Notice of Disciplinary Action for failing to obey proper direction made and given by a superior and for incompetent or inefficient performance of duties. Plaintiff was suspended for three workdays without pay as a result of her disciplinary action. (Deposition of Susan Dyer (##14-4; 17-6) (hereinafter "Dyer Depo. or "Plaintiff Depo.") pp. 47-49; Tippitt Depo. pp. 90-91; (#14-9) (exhibits including Notice of Disciplinary Action).

Plaintiff states that she met with Tippitt after receiving this suspension and produced positive evaluations by museum guests to refute Pasour's claims that she provided poor customer

service. (Tippitt Depo. at p. 110). Plaintiff states that she informed Tippitt of multiple mistakes by Pasour, similar to those Plaintiff was accused of, but was unwilling to file a formal grievance or contest her suspension because she feared retaliation from Pasour. (#1-1 at ¶17; Tippitt Depo. at 49-50). Plaintiff also states that she told Tippitt at that time that Pasour screamed and yelled at women in the office, but not the men. (Dyer Depo. pp. 90-94). In terms of her experience working with Pasour, Plaintiff states that Pasour was often out of the office and unavailable during standard working hours, did not respond to many of her telephone calls or emails at all or in a timely manner, bullied, belittled, and yelled at her, and instead of answering her questions about documents she handed him, threw them in the trash in an angry manner. (Dyer Depo. at pp. 38, 39, 41, 42, 43, 44, 48, 52, 54; (#1-1 at ¶15); Affidavit of Susan Dyer (#17-2) (hereinafter "Dyer Aff.") at ¶ 4.

Defendant states that in February 2013, Tippitt and Pasour learned from Dellinger that there had been a mistake in budgeting the hours for several of the part-time museum employees, including those of Plaintiff. (Pasour Depo. pp. 170-174; Tippitt Depo. pp. 50-53). When Plaintiff was hired, Tippitt and Pasour mistakenly believed the position was budgeted for 1,400 hours, but it was actually budgeted for 990 hours. Tippitt and Pasour realized that Plaintiff and others were close to having exhausted those budgeted hours for the fiscal year, which ran July 1, 2012 - June 30, 2013. (Pasour Depo. pp. 170-174; Tippitt Depo. pp. 50-53).

On or about March 8, 2013, Pasour notified Plaintiff that the budgeted hours available for her position were approaching the maximum allowance of 990 hours for the fiscal year, and then told her that Defendant had reapportioned the remaining hours so that she could work through April. (Pasour Depo. pp. 170-174; Tippitt Depo. pp. 50-53). Pasour also discussed with Plaintiff

that since the summer months did not require field trip scheduling, it would be best not to bring her back on July 1, 2013 (the start of the new fiscal year), but instead for her to begin in late August when the school field trip scheduling commenced. (Pasour Depo. p. 174). Plaintiff states that around that time—the day after she received notice that she would be furloughed—she made a verbal complaint about Pasour to Tippitt, telling Tippitt that she "wanted to make sure that [her] job was safe and secure because [she] felt like [Pasour] was trying to get [her] out the door because he hated women." (Dyer Depo. p. 96).

Plaintiff last worked on Thursday, April 5, 2013. Tippitt testified at her deposition that at the time Plaintiff stopped working, she "still needed improvement because all of the functions that really should have been with that job were not being performed within it," that Plaintiff had not met expectations, and that she would not have recommended that Plaintiff be hired back. (Tippitt Depo. pp. 56-57). Along the same lines, Defendant notes that in February 2013, Pasour produced a memo to Tippitt highlighting what he perceived as "continued poor performance" by Plaintiff. (Pasour Depo. p. 139). However, Dellinger testified at his deposition that he thought Plaintiff's performance had improved to the level of requiring no further attention by the early months of 2013. (Dellinger Depo. p. 65).

On April 13, 2013, Plaintiff sent an email to City Manager Ed Munn complaining of the way Pasour had treated her at work, including making specific complaints about the way he treated other women in the office. (Tippitt Depo. p. 125; Munn Depo at pp. 19-22; (#17-1 at p. 42)). This is the first time Plaintiff made a written complaint about Pasour's treatment towards her and, in general, other women. Subsequent e-mail correspondence between Plaintiff and Tippitt clarified that Plaintiff considered her complaint a formal grievance.

On April 23, 2013, Chuck Dellinger began an investigation of Plaintiff's grievance and conducted an on-site visit to the Schiele Museum. (Tippitt Depo. pp. 125, 139; Dellinger Depo. pp. 56, 75). As part of the investigation, he met with most of the museum staff, including all employees who worked under Pasour. (Dellinger Depo. p. 82). Mr. Dellinger also had a phone conference with one staff member later that evening. (Dellinger Depo. pp. 75-84, 128-29). Plaintiff notes that for the investigation, Dellinger did not develop a set list of questions to cover common points in each interview or take any notes during the interviews. (Dellinger Depo. pp. 77, 78). He did not interview Pasour as part of his investigation. (Pasour pp. 177-80). Plaintiff also calls into question Dellinger's impartiality as an investigator, noting that the two men have known each other for thirty years. (Dellinger Depo. p. 22). Plaintiff also notes that Dellinger's investigation revealed reports of women crying after Pasour raised his voice to them. (Dellinger pp. 92-94).

Ultimately, Dellinger concluded there was no harassment or discrimination by Pasour towards women, and that while there were reports of Pasour being gruff, he was gruff towards both men and women. (Dellinger Depo. pp. 83-84). He recommended Pasour take a leadership class, but did not require it. (Pasour Depo. p. 180). Subsequently, Dellinger spoke with Plaintiff by telephone, indicating he had concluded his investigation and found no discrimination. (Dellinger Depo. pp. 133-34). On May 6, 2013, Dellinger issued a Memorandum titled "Grievance Determination" in which, among other things, Dellinger found no wrongdoing at the museum. (#14-9 p. 14). He also determined that Plaintiff did not allege sex-based discrimination against Pasour or the City. Id. Plaintiff notes that Dellinger made such determination despite the express wording of her e-mail to Munn that she had documentation of "constant harassing,

hostile, intimidating, bullying, 'scare tactics' used by Tony Pasour towards the women in the office" and statements that "he does this only to the women not the men," see (#17-1 at p. 42), as well Dellinger's own statements in his May 6, 2013 letter that she had expressly told him that she was concerned about working in a hostile work environment. (#14-9 p. 14). In his May 6 letter, Dellinger explained that he did not find any wrongdoing but that as a result of his investigation, he planned to incorporate more training in the area of education program scheduling, better communication between staff at all levels, and more training for supervisory staff (including Pasour) in dealing with problems and employee concerns. Id.

 Defendant states that following the investigation, Dellinger determined that Pasour would benefit from some voluntary supervisory training, that it was evident that Pasour needed a full-time office assistant, and that the museum should perform an assessment to determine if that could be done. (Dellinger Depo. pp. 19-21, 83; Pasour Depo. pp. 29-31). Pasour went to supervisory training and had additional coaching by Tippitt, and the Museum evaluated the potential for a full-time office assistant position for Pasour. (Dellinger 30(b)(6) Depo. (#14-3; 17-8) pp. 14-15, 95). Assistant Museum Director Carl McKinnon performed the evaluation in the summer of 2013. (#13-6). He determined that in order to establish a full-time position, the museum needed to find hours from other positions so as not to create additional personnel costs to the museum and the City. Id. McKinnon eventually presented a plan and recommendation to Tippitt which proposed that an Office Assistant position be created. Id. The funding for the position was to be covered by eliminating the two part-time Guest Services positions and restructuring other part-time hours in the Interpretation Division. Id. In September 2013, the City Manager approved the creation of a full-time Office Assistant position at the Schiele Museum by

eliminating two part-time positions, reducing hours of other positions, and combining some duties of other part-time employees. (Id.; Tippitt Depo. p. 131; Dellinger 30(b)(6) Depo. p. 34).

Defendant states that on September 26, 2013, Dellinger called Plaintiff with the intent to inform her of this change and reorganization, and drafted a letter for Plaintiff setting forth the changes and her options. However, before speaking with Plaintiff or sending the letter, Dellinger received a letter dated September 27, 2013 from Plaintiff's counsel. (#14-9 at p. 13; Dellinger Depo. p. 137; Dyer Depo. pp. 7-9). In response, Defendant, through its counsel, sent correspondence to Plaintiff's attorney providing official notification that the part-time Guest Services Specialist position Plaintiff held would be permanently eliminated in thirty (30) days, or on November 15, 2013, under the City's Reduction in Force Policy. (#14-8). Plaintiff was also notified that she would be entitled to thirty (30) days severance pay and would be able to apply for any jobs available within the City, including the newly created Office Assistant position. (Id.; Dellinger Depo. pp. 145-46).

Plaintiff states that the Office Assistant position was not advertised until March 2014, and the City did not notify Plaintiff of the posting. (30(b)(6) Depo at p. 88). Plaintiff did not apply for the new position, though she did apply for other jobs at the museum without any response. (Dyer Depo. p. 12-13).

Relevant to her allegations of discriminatory conduct and a hostile work environment, Plaintiff has introduced evidence that Pasour had a history of negative interactions with female subordinates. Verbal complaints were brought to Tippitt by former employees Becca Kirlin, Suzanne Simmons, and Amy Ballard, see (Tippitt Depo. pp. 24, 28, 30), but there is no evidence of any similar reports of complaints by male employees to Tippitt about Pasour. There is no

evidence of testimony from these women or any paper trail of such complaints in the record.

By her Complaint (#1-1), Plaintiff alleged gender discrimination and retaliation in violation of Title VII (Count I), negligent supervision and retention of employee (Counts II and III), and wrongful termination in violation of North Carolina public policy (Count IV). Defendant moved for Summary Judgment on all claims. (#13). One week following oral arguments on Defendant's Motion for Summary Judgment, Plaintiff filed a "Stipulation of Dismissal of Plaintiff's Claim for Negligent Supervision and Negligent Retention With Prejudice" (#22), stating that pursuant to Fed. R. Civ. P. 41(a)(ii), Plaintiff stipulated to the dismissal of Plaintiff's claims for negligent supervision and negligent retention (Counts II and III) with prejudice. The court will therefore only proceed with an analysis of Counts I and IV.

## II.　STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id. The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted). Once this initial burden is met, the burden shifts to the nonmoving party. That party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3.

The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. Instead, that party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). In the end, the question posed by a summary judgment motion is whether the evidence "is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 252.

### III. DISCUSSION

#### A. Title VII Claims

At oral arguments, the court discussed with Plaintiff exactly what claims she is pursuing pursuant to Title VII. The complaint titles Count One as "Title VII-Gender Discrimination and Retaliation." See Complaint (#1-1) at ¶ 33-36. While the body of the complaint generally alleges that Plaintiff suffered from a hostile work environment, see, e.g., Complaint (#1-1) at ¶ 17, 18, 24, there is no mention of a hostile work environment within the paragraphs of Count One. Plaintiff clarified at oral arguments that under Title VII, she is pursuing a hostile work environment claim, a retaliation claim, and a claim for discriminatory discharge on the basis of gender.

Defendant has moved for summary judgment on all claims, see (#13 at p. 2), but did not brief the issue of a hostile work environment claim, explaining at oral argument that it was not obvious from the phrasing of Count One that Plaintiff sought such a claim. Because Defendant did not brief that claim, the record does not contain any substantive discussion by either party of the facts of this case as applied to the legal standards governing hostile work environment claims.

The court agrees that it was unclear from the face of the complaint that Plaintiff intended to assert a hostile work environment claim, as Count One expressly listed "Discrimination" and "Retaliation," but made no mention of a hostile work environment. However, the court finds that a claim for "Discrimination" under Title VII could plausibly encompass a hostile work environment claim. Though it would behoove Plaintiff to state her claims with greater precision in the future, the court finds that because Plaintiff alleged a hostile work environment several times in the body of the complaint, she should be allowed to amend her pleading to more clearly state such a claim. See Fed. R. Civ. P. 15(a) (allowing a party to amend a pleading with the court's leave). Because Defendant has ostensibly moved for summary judgment on Plaintiff's hostile work environment claim by virtue of moving for summary judgment on all claims, and because the court cannot make the parties' arguments on their behalves, the court will instruct Plaintiff to file an amended complaint within 14 days of this Order. By such amended complaint, Plaintiff must clearly set forth the grounds for relief sought for her hostile work environment claim.[1] See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) ("Although a complaint "does

---

1 "Title VII is violated 'when the workplace is permeated with discriminatory [sex-based] intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331 (4th Cir. 2003) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). To establish a hostile work environment claim, Plaintiff must show that

not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.") (internal citations omitted).

For the reasons stated herein, the court finds Plaintiff has raised genuine issues of material fact as to her Title VII claims for retaliation and discriminatory discharge and will therefore deny summary judgment on Count One for those two avenues of relief under Title VII. To the extent that Defendant has moved for summary judgment on a Title VII hostile work environment claim, the court will deny that motion without prejudice, subject to renewal following the close of evidence at trial.

### *a. Discriminatory discharge on the basis of gender*

Under Title VII, it is unlawful for an employer to terminate an employee on the basis of the employee's gender. 42 U.S.C. § 2000e–2(a). To survive a motion for summary judgment, a Plaintiff asserting a Title VII claim must provide evidence of discrimination through either direct evidence or the now familiar burden-shifting McDonnell Douglas "pretext framework." See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). To prevail under the McDonnell Douglas framework, Plaintiff must first establish a prima facie case of unlawful discrimination. Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 575 (4th Cir. 2015). If Plaintiff does

---

there is (1) unwelcome conduct; (2) based on the Plaintiff's sex; (3) that is sufficiently severe or pervasive enough to alter the Plaintiff's conditions of employment and to create an abusive work environment; and (4) that is imputable to the employer. Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 277 (4th Cir. 2015); Smith v. Woodcraft Indus., Inc., No. 514CV00200RLVDSC, 2016 WL 492292, at *8 (W.D.N.C. Feb. 5, 2016). The court has considered the evidence of record in the context of these standards, and notes that it is particularly interested in how such evidence would satisfy the latter two prongs. Additionally, the court is interested in Plaintiff's arguments as to the applicable legal standard for imputing liability to the employer in this case, including whether Defendant is allegedly liable for acts of a co-worker or supervisor of Plaintiff. See Boyer-Liberto, 786 F.3d 264; McKinnish v. Brennan, No. 14-2092, 2015 WL 6798457 (4th Cir. Nov. 6, 2015); Reid v. Dalco Nonwovens, LLC, No. 5:13-CV-105-RLV-DCK, 2016 WL 51271 (W.D.N.C. Jan. 4, 2016) (setting forth the different standards for misconduct by employees with various levels of supervision over an employee plaintiff).

so, the burden of production shifts to Defendant to articulate a legitimate, nondiscriminatory reason for the termination. Id. at 575-76. Once Defendant has met its burden, the burden shifts back to Plaintiff to demonstrate that Defendant's proffered reason is not the true reason, but a mere pretext for discrimination. Id.

In order to establish a prima facie case for gender discrimination under the McDonnell–Douglas framework for termination of employment, Plaintiff must show (1) that she is a member of a protected class; (2) that she suffered an adverse employment action; (3) that at the time the employer took the adverse employment action he was performing at a level that met his employer's legitimate expectations; and (4) that she was either replaced by or treated differently than persons outside the protected class. McDonnell Douglas, 411 U.S. 792; King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003).[2]

Here, there is no dispute that Plaintiff satisfies the first two elements of a prima facie case: Plaintiff is a female and thus a member of the protected class, and she suffered an adverse employment action by virtue of her position being eliminated. The parties dispute whether Plaintiff was performing her job satisfactorily at the time of discharge. Defendant notes that both Pasour and Tippitt recommended that Plaintiff be terminated shortly after she started working. Tippitt also testified at her deposition that when Plaintiff last worked in April 2013, Plaintiff had not met expectations and she would not have recommended that she be hired back. (Tippitt Depo. pp. 85, 56-57). However, Dillinger stated in his deposition that he did not perceive Plaintiff as having any performance issues as of early 2013. Additionally, the fact that Defendant told Plaintiff that she would be allowed to apply for the new Office Assistant position indicates

---

2 The court notes that Plaintiff, by her brief, misstates the standards for prima facie claims for termination and retaliation by combining the two standards and failing to fully state the requirements. See (Pl. Resp. (#17) at p. 13).

that Defendant was not entirely unsatisfied with Plaintiff's job performance. The court finds that a genuine issue of material fact exists on the third prong as to whether Plaintiff was performing her job satisfactorily at the time she last worked.

As to the fourth prong, the evidence here shows that Plaintiff was not technically replaced because her position was eliminated. However, Plaintiff has introduced evidence through her own testimony that Pasour routinely treated her disrespectfully, as well as testimony from Tippitt that three other women had complained about his management style. In the light most favorable to Plaintiff, the court finds that she has satisfied her burden of showing that she was treated differently than co-workers outside the protected class.

While the court finds that Plaintiff has stated a prima facie case, it also finds that Defendant has articulated a legitimate, non-discriminatory reason for its decision to eliminate Plaintiff's job. Defendant argues that as evidenced by the initial disciplinary action taken against Plaintiff, she was not performing to her employer's expectations and was still not meeting those expectations on her last day of work. Defendant also argues that the reorganizational needs of the Schiele Museum represent legitimate non-discriminatory reasons for the elimination of two guest services positions and the creation of the Office Assistant position. As noted above, the court finds that the evidence of Plaintiff's performance abilities at the time she was fired is insufficient to show that she was terminated on that basis. Indeed, Defendant explicitly told Plaintiff that she would be coming back to work in the fall at the time she last worked. However, the court does find that the reorganizational plan and ultimate elimination of Plaintiff's position in order to clear up funding for a new position is a legitimate, non-discriminatory reason for terminating her position.

Having made such determination, the burden now shifts to Plaintiff to introduce evidence of pretext. To show pretext, Plaintiff may introduce evidence to show that "the employer's proffered explanation is unworthy of credence," Holland v. Washington Homes, Inc., 487 F.3d 208, 214 (4th Cir. 2007). Plaintiff alleges that Defendant's proffered reasons are pretext based on the temporal proximity of Plaintiff's written complaint of gender discrimination on April 13, 2013, and Defendant deciding to eliminate Plaintiff's position between May and July 2013. Plaintiff was told that she was being laid off for the summer due to a temporary budgetary glitch, not for performance reasons, and that she would be returning to work again when school started back in August. She was not informed of Defendant's decision to eliminate her position until approximately October 16, 2013, two months after she was supposed to return to work. The court finds that considering the evidence at this stage in the proceedings, the timing of events here does create an issue for Defendant. Even though it has stated plausibly that it was eliminating Plaintiff's position for budgetary and reorganizational reasons, the fact remains that it only did so after Plaintiff made complaints about Pasour's allegedly sexist and hostile behavior. The court finds that a fact-finder could find such explanation "unworthy of credence" in these circumstances. Additionally, the fact that Defendant went almost an entire year before it hired an Office Assistant for Pasour—the new position supposedly causing the reorganization—calls into question whether the position was really so necessary as to require an immediate termination of Plaintiff's position. The court thus finds that Plaintiff has satisfied her burden of showing pretext at this stage in the proceedings. Accordingly, the court will allow Plaintiff's claim for discriminatory discharge to proceed and deny Defendant's Motion for Summary Judgment as to this claim.

### b. *Retaliation*

To make a prima facie case of retaliation, Plaintiff must show that: (1) she engaged in a protected activity; (2) her employer acted adversely against her; and (3) the protected activity was causally connected to the employer's adverse action. Mackey v. Shalala, 360 F.3d 463, 469 (4th Cir. 2004). A protected activity constitutes conduct that "oppose[s] any practice made an unlawful employment practice" by Title VII. 42 U.S.C. § 2000e-3(a). The Fourth Circuit has instructed districts court to take an "expansive view of what constitutes oppositional conduct, recognizing that it 'encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities.'" DeMasters v. Carilion Clinic, 796 F.3d 409, 417 (4th Cir. 2015) (quoting Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 259 (4th Cir. 1998)). Additionally, "while the oppositional activity must be directed to 'an unlawful employment practice' under Title VII…we should also interpret 'unlawful employment practice' broadly…[t]hus, an employee is protected when she opposes not only ... employment actions actually unlawful under Title VII but also employment actions [she] reasonably believes to be unlawful." Id. (internal citations and quotations omitted). As to the causal connection in the third element of a Title VII retaliation claim, "but-for" causation is required. Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2534 (2013). On summary judgment, Plaintiff's burden is to come forward with evidence that the alleged "unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Id.

Here, Defendant argues that Plaintiff cannot show that she engaged in protected activity because she neither complained nor submitted a grievance to the City related to Pasour's alleged

gender discrimination or alleged hostile work environment until after she last worked in April 2013. The court finds this argument futile, as Defendant explicitly told Plaintiff that she was being furloughed and would be returning to work in the fall. Plaintiff did not receive an official letter informing her that her position was being terminated until the fall of 2013. Inasmuch as Plaintiff submitted a written complaint about the way Pasour treated men and women in the office differently, the court finds that she has satisfied her burden of showing that she engaged in a protected activity.

As to the second prong, Plaintiff clearly meets the requirement that her employer act against her because Defendant eliminated her job shortly after she made a complaint. As to the third prong, the courts finds that Plaintiff has presented evidence at this stage in the proceedings to satisfy the "but for" causation standard. In essence, but for her complaint about what she perceived as inappropriate treatment of women in the office, Defendant would not have made any sort of investigation. Defendant admits that the results of the investigation led them to terminate Plaintiff's position. At this stage, the court finds that Plaintiff has established a prima facie case of retaliation and will therefore deny Defendant's Motion for Summary Judgment as to this claim.

### B.  Wrongful Termination in Violation of NC Public Policy

As to Plaintiff's claim for wrongful discharge brought pursuant to the North Carolina Equal Employment Practices Act ("NCEEPA"), that law states in relevant part:

> It is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age, sex or handicap by employers which regularly employ 15 or more employees.

N.C. Gen.Stat. § 143–422.2. The claim for wrongful discharge can be analyzed under the same

analysis as the Title VII claim. See, e.g., Moser v. Driller's Serv., Inc., 988 F. Supp. 2d 559, 565 (W.D.N.C. 2013); Matthews v. Novant Health, Inc., No. 3:09CV494-RJC-DSC, 2010 WL 2131559, at *7 (W.D.N.C. Apr. 29, 2010) (report and recommendation adopted) ("Regarding Plaintiff's state public policy claim, North Carolina courts 'look to federal decisions [in employment discrimination cases] for guidance in establishing evidentiary standards and principles of law to be applied in discrimination cases.'") (quoting N.C. Dept. of Correction v. Gibson, 301 S.E.2d 78, 82 (N.C. 1983)). Because the court finds for the above reasons that summary judgment is inappropriate as to Plaintiff's Title VII claims for discriminatory discharge and retaliation, the court will deny Defendant's Motion for Summary Judgment on the wrongful discharge claim.

## ORDER

**IT IS, THEREFORE, ORDERED** that Defendant's Motion for Summary Judgment (#13) is **DENIED** as to Count I for Plaintiff's claims for retaliation and discriminatory discharge pursuant to Title VII, and **DENIED** as to Count IV for her claim for wrongful termination in violation of North Carolina public policy.

**IT IS FURTHER ORDERED** that Defendant's Motion is **DENIED WITHOUT PREJUDICE** as to renewal at the close of evidence at trial regarding any claim that Plaintiff may wish to pursue pursuant to a Title VII hostile work environment claim.

**IT IS FURTHER ORDERED** that Plaintiff file an amended complaint within 14 days of this Order, clearly setting forth her claim for a hostile work environment pursuant to Title VII.

Signed: February 29, 2016

Max O. Cogburn Jr.
United States District Judge

-17-